

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10606*

October 31, 2023

**BY ECF**

The Honorable Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

>    Re:    *United States v. Shon Morgan*, 22 Cr. 337 (KMK)

Dear Judge Karas:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Shon Morgan, scheduled for November 8, 2023, at 2 p.m. As described herein, the Government respectfully submits that a sentence within the advisory Sentencing Guidelines range of 87 to 108 months' imprisonment would be sufficient, but not greater than necessary, to reflect the seriousness of the defendant's conduct and satisfy the purposes of sentencing.

This case involves extremely serious conduct. The defendant and his co-conspirators made extensive plans to commit two home invasion robberies, one of which involved a plan to break into a family's home in the middle of the night, tie up and pepper spray the parents, and then do whatever was necessary to force a teenager to disclose the code to what the defendant and/or his co-conspirators believed to be tens of millions of dollars in Bitcoin. The defendant and his co-conspirators did not just plan these actions; they were in the act of executing their violent plan and would have successfully accomplished their nefarious goals had they not been thwarted by law enforcement. In fact, two co-conspirators broke into the victim's basement, one later admitting to possessing a real firearm and the other carrying a backpack containing an imitation firearm, brass knuckles, and a taser. Luckily, the violent plan was thwarted when the victim's security alarm was triggered, but the scheme demonstrates an intent to commit serious violence.

**A.    Background**

On or about May 7, 2020, the defendant and his co-conspirators traveled to Massachusetts to break into an individual's ("Victim-1") home, and force Victim-1 to provide the code to his/her Bitcoin. (PSR ¶ 22.) While in Massachusetts, the defendant and his co-conspirators went to where they believed to be Victim-1's residence and conducted reconnaissance, taking videos and photographs of the outside of the home, as they searched for evidence of cameras and planned

where to break in and how to flee. Ultimately, the defendant and his co-conspirators did not follow through with that robbery because they were deterred by police presence in the area. (*Id.*)

Undeterred by their unsuccessful efforts in Massachusetts, almost immediately after returning home, the defendant and other co-conspirators began planning another robbery, targeting an individual who contemporaneous news reports claimed had stolen around $24 million in Bitcoin ("Victim-2"). (*See id.* ¶ 16.) Other co-conspirators were recruited to act as getaway drivers, monitor police scanners, and/or participate in the robbery itself. The defendant and his co-conspirators gathered equipment for the robbery, which included a firearm, bulletproof vests, a taser, a pellet gun that resembled a 9mm handgun, brass knuckles, a battering ram, and dark-colored clothing. (*Id.* ¶¶ 17, 21.)

On or about May 18, 2020, the defendant and a co-conspirator traveled from the Washington D.C. area to Rochester, New York, where they stayed in an Airbnb for several days as they planned the robbery. (*Id.* ¶ 17.) Over the next few days, the defendant and certain co-conspirators went to Victim-2's home in Irvington, New York, on several occasions to conduct reconnaissance, looking for security cameras, alarm systems, and doors and windows that they could break into. (*Id.* ¶¶ 18-20.) During one of the reconnaissance operations, some of the co-conspirators remained at the Airbnb to monitor the police scanners and update the others about any police activity. (*Id.* ¶ 20.) Meanwhile, the defendant and other co-conspirators entered the backyard of Victim-2's home and peered inside, coming close to breaking in, but ultimately deciding that it was too risky at that time. (*Id.*) The co-conspirators used a cellphone application that allowed them to share voice messages in real time, akin to a walkie-talkie, and further allowed them to program the application so that messages were deleted upon their playback. (*Id.*)

In the days leading up to the robbery, the defendant and co-conspirators had meetings to discuss their violent plot. (*Id.* ¶ 17.) Such meetings involved discussing the need to tie up Victim-2's parents and spray them with pepper spray, while using weapons to do whatever was required until Victim-2 provided the Bitcoin code. (*See id.* ¶¶ 17, 25-26 (referencing plan to "torture and possibly kill" family to get the Bitcoin code).)

In the early morning hours of May 23, 2020, the defendant and his co-conspirators decided to execute their planned home invasion robbery. (*Id.* ¶ 21.) As practiced, some co-conspirators remained at the Airbnb to monitor police scanners and inform the others of any police activity. (*Id.*) Meanwhile, the defendant and other co-conspirators, dressed in dark-colored clothing, packed the equipment, and drove to Victim-2's home. (*Id.*) While in Victim-2's backyard, the defendant and his co-conspirators discussed how to disable the home's security alarm without triggering it, and further discussed where and when to break into the home. (*Id.*) One co-conspirator broke a window and snuck into the basement with another co-conspirator. (*See id.*) Another co-conspirator cut a cord to the home's security system, which triggered an alarm, causing individuals in the home to wake up and call 911. (*See id.*) One co-conspirator who entered the basement became trapped, while the defendant and other co-conspirators fled. (*See id.*) Ultimately, law enforcement responded to Victim-2's home quickly and arrested the co-conspirators who were in the basement and in the vicinity of the home at the time. (*Id.*)

Shortly after the attempted robbery, law enforcement found a backpack that was left in Victim-2's basement. (*Id.*) Inside the backpack was a taser, a pellet gun resembling a 9mm handgun, and brass knuckles. (*Id.*) Law enforcement subsequently found and searched the car that the defendant and his co-conspirators used to drive to Victim-2's home. (*Id.*) Inside the car was a battering ram and bulletproof vests, two cans of pepper spray, and a flashlight. (*See id.*) It was later determined that a co-conspirator was in possession of a real firearm at the time of the attempted robbery. (*Id.*)

On June 14, 2022, the defendant was indicted for conspiring to commit a Hobbs Act robbery from at least on or about May 18, 2020 until on or about May 23, 2020, in violation of Title 18, United States Code, Section 1951. (*Id.* ¶¶ 1-2; ECF No. 2.) On June 26, 2023, without a plea agreement, the defendant appeared before Magistrate Judge Judith C. McCarthy and allocuted to his criminal conduct charged in the indictment. (PSR ¶ 4.)

## B. The Government's Pimentel Letter and Guidelines Calculation

On January 31, 2023, pursuant to the suggestion of the Second Circuit in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), the Government submitted a letter to the defendant, setting forth the Government's position regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to the defendant. (PSR ¶ 5.) As stated in the *Pimentel* letter, the applicable Guidelines sentence is 87 to 108 months' imprisonment, based on an offense level of 29 and a criminal history category of I. (*Id.*)

## C. Presentence Investigation Report and Probation's Recommended Sentence

The United States Probation Office ("Probation") agrees with the Government's calculation of the applicable Guidelines, concluding that the applicable Guidelines sentence is 87 to 108 months' imprisonment, based on an offense level of 29 and a criminal history category of I. (*Id.* ¶ 88.) Nevertheless, Probation recommends a custodial sentence of 60 months—*i.e.*, below the Guidelines range calculated by Probation and set forth in the *Pimentel* letter—followed by three years of supervised release. (*Id.* at 24.)

## D. The Defendant's Submission

On October 27, 2023, the defendant filed a corrected sentencing submission principally asserting that he should receive a below-Guidelines sentence because of his young age at the time of the offense, lack of a criminal history, and efforts at post-offense rehabilitation. (*See* ECF No. 42.) The defendant also challenges the Guidelines calculation in the PSR and *Pimentel* letter because he objects to: (1) the five-point enhancement pursuant to U.S.S.G. ¶ 2B3.1(b)(2)(C) for possessing a firearm during the offense because the defendant claims that, while he "was aware that Mr. Pineda was in possession of a real firearm" at the Airbnb, where the defendant and his co-conspirators were saying as they planned the armed robbery, "there is no evidence that [the defendant] was aware that Pineda had a real firearm at the time of" the attempted robbery (*id.* at 3 & n.2); and (2) the seven-point enhancement pursuant to U.S.S.G. ¶ 2B3.1(b)(7)(H) for an intended loss amount of more than $9.5 million because (a) the Third Circuit recently held that the loss enhancement pursuant to U.S.S.G. ¶ 2B1.1 is limited to actual loss, (b) the price of Bitcoin

fluctuates, and (c) by the time the defendant and his co-conspirators executed their violent scheme, Victim-2 no longer had any of the Bitcoin they sought to steal (*id.* at 6-8).

## E.  Discussion

### 1.  Applicable Law

The Guidelines still provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing court must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2.  A Guidelines Sentence Is Appropriate in This Case

The Government respectfully submits that a sentence within the advisory Guidelines range of 87 to 108 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing. In particular, the nature and circumstances of the offense, the need to promote respect for the law, and the need to assure both general and specific deterrence, all justify such a sentence.

As described above, the nature and circumstances of the defendant's conduct is incredibly serious, involving the recruitment of others, extensive planning, and the intent to commit two violent home invasion robberies within the span of a few weeks. The defendant and his co-conspirators specifically identified and targeted individuals who they believed had millions of dollars of Bitcoin. They then made extensive arrangements and traveled significant distances with the intent to break into the homes of their identified victims. In the first instance, the defendant traveled out-of-state from the Washington D.C. area to Massachusetts, and in the second instance, he again traveled out-of-state to Irvington, New York. The defendant and his co-conspirators spent days scouting their targeted locations, visiting homes multiple times, and taking photographs and videos. This reconnaissance allowed the defendant and his co-conspirators to determine where they could break in and whether there were security systems that they needed to avoid or disable. For the second planned robbery, the defendant and his co-conspirators conducted their reconnaissance during both the day (so that they could have the best view of the home and its surrounding area), and the night (so that they could assess what conditions would be like at the time of the actual robbery). And their plans included not only how to break into their victims' homes, but the violence they would inflict once inside. Specifically, in connection with the second planned robbery, the defendant and his co-conspirators had meetings where they discussed plans to tie up Victim-2's parents and spray them with pepper spray. Meanwhile, they planned to beat up Victim-2 and do whatever was necessary to force Victim-2 to divulge the code to the Bitcoin.

It is particularly troubling that the defendant and his co-conspirators came dangerously close to accomplishing their violent goals. After extensive preparations, they went to Victim-2's home around 3 a.m., wearing dark-colored clothing and carrying their equipment, which included a firearm, bulletproof vests, a taser, a pellet gun that resembled a 9mm handgun, brass knuckles, a battering ram, and pepper spray, among other items. They had co-conspirators monitor a police scanner and provide updates on any police activity, and they maintained constant contact with one another through their walkie-talkie-like messaging application. Co-conspirators climbed inside Victim-2's basement, one with a firearm and another carrying a backpack filled with dangerous instruments, including a taser, brass knuckles, and an imitation firearm. If not for the triggered security alarm and Victim-2's family being awakened, the defendant and his co-conspirators were on their way to implementing the violent part of their plan to force Victim-2 to provide the code to the Bitcoin.

Although law enforcement was able to thwart the defendant and his co-conspirators, their conduct has had serious consequences. The defendant and his co-conspirator's actions have traumatized Victim-2 and his/her family, including young children who were in the home during the break-in. (PSR ¶¶ 24-26.) Not only did the family experience significant trauma when they were awakened in the middle of the night to learn that someone had broken into their basement, but the attempted robbery has continued to negatively impact the family. The defendant's actions have fundamentally altered the family's sense of safety in their home, as they now spend a "fortune" on private security, suffer from insomnia, have deteriorated relationships due to lingering stress caused by the incident, and if a noise is heard at night, the children wake up in tears out of fright. (*Id.* ¶¶ 24-26.)

The need for both specific and general deterrence further support a Guidelines sentence. With respect to specific deterrence, the defendant's willingness to plan and attempt to execute

serious robberies is troubling.  With respect to general deterrence, a Guidelines sentence is appropriate to send the message to others that planning and attempting to execute violent robberies will lead to serious sentences of imprisonment.  In particular, the Government is aware of other individuals who have been the targets of other similar robberies focused on obtaining Bitcoin, and accordingly a serious sentence of imprisonment here can serve to deter further similar crimes.

### 3.    The Defendant's Submission Does Not Justify a Below-Guidelines Sentence

The defendant asks the Court to impose a sentence substantially below the advisory Guidelines range because he has no prior criminal history, he was young age at the time of the offense, and he made efforts at post-offense rehabilitation.  (*See* ECF No. 42.)  Although these are factors that the Court may consider in imposing a sentence, the Government respectfully submits that they do not justify imposing a sentence that is one-third of the top Guidelines sentence and three-fifths of Probation's recommended sentence.  Additionally, the defendant's Guidelines-based challenges are meritless and should be rejected by the Court.

#### a.    The Defendant's History and Characteristics Do Not Justify a Below-Guidelines Sentence

With respect to the defendant's lack of any criminal history, the Government respectfully submits that the defendant's conduct shows a clear intent to commit serious violence that is deserving of a serious sentence of imprisonment, and the Guidelines appropriately account for having no criminal history.  While the defendant may not have been the ultimate mastermind of the plan to break into two different homes and violently rob individuals of their Bitcoin, the defendant's desire and ability to implement this plan could not have been clearer.  As described above, the defendant was an active participant in the many stages of planning, including recruiting others and engaging in multiple rounds of reconnaissance.  Ultimately, the defendant and his co-conspirators were in position to complete their violent plan and very easily could have done so had Victim-2's security alarm not been triggered.

In terms of the defendant's age at the time of the offense, 19 years old is old enough to know right from wrong.  The defendant did not experience a momentary lapse in judgment typical of teenagers acting impulsively; to the contrary, the defendant spent many days planning a violent crime, including by purchasing equipment for the scheme and going on several reconnaissance missions.  While the Court may consider the defendant's age, it in no way excuses such troubling behavior.

Regarding the defendant's efforts at post-offense rehabilitation, the Government submits that this factor should be given little weight by the Court.  The defendant should not be rewarded for doing what he was always supposed to be doing.  Indeed, the defendant has demonstrated only that he can behave himself when being monitored by pre-trial services (well, only partially, given his multiple failed drug tests while out on bond).  But, of course, this in no way erases the immense trauma inflicted upon Victim-2 and family.

b.  The Defendant's Guidelines-Based Arguments Are Meritless

The defendant asserts that the five-point enhancement for possessing a firearm during the robbery should not apply to him because he was allegedly unaware that his co-conspirator, Pineda, brought a real firearm with him to Victim-2's home, as the defendant apparently believed that Pineda left the firearm at their Airbnb and that the group brough only an imitation firearm.  (*See* ECF No. 42 at 3-4.)  The Court should reject this argument because the Guidelines are clear that, pursuant to U.S.S.G. § 1B1.3(a), a defendant who participates in a jointly undertaken criminal activity is accountable for the conduct of others that was "within the scope of the jointly undertaken criminal activity"; "in furtherance of that criminal activity"; and "reasonably foreseeable in connection with that criminal activity." *United States v. Carter*, 2018 WL 571945, at *3-4 (N.D. Ind. Jan. 26, 2018) (applying five-point enhancement because co-conspirator's possession of a firearm was deemed foreseeable when they planned a robbery, dressed in dark-colored clothing, and the defendant previously saw a co-conspirator with a firearm).  Moreover, the Government submits that the defendant's claim is not credible, as he recruited Pineda to participate in the robbery, held meetings with Pineda and other co-conspirators to discuss their plan to tie up the parents and do whatever was necessary to force a teenager to disclose a Bitcoin code, and concedes that he knew Pineda possessed a real firearm that was transported over 200 miles from the Washington DC area.  Nevertheless, even if the defendant disclaims actual knowledge that Pineda possessed a firearm during the robbery attempt—while Pineda accepted responsibility for doing so—"for purposes of § 2B3.1(b)(2)(c), the proper inquiry is whether the district court could find, by a preponderance of the evidence, that it was reasonably foreseeable to [the defendant] that [his co-conspirator] would brandish or possess a weapon during the robbery, and not whether [the defendant] had actual knowledge of the gun prior to the robbery." *United States v. Montes-Fosse*, 824 F.3d 168, 171 (1st Cir. 2016); *see also id.* ("We have stated before that guns are often 'tools of the trade' when it comes to certain offenses, and that an awareness of the general plan is sufficient to infer knowledge that the weapons would be used to carry that plan through to completion.").  The Government submits that it was reasonably foreseeable to the defendant that his co-conspirator would bring a real firearm to their planned violent robbery that include many other weapons when the defendant knew his co-conspirator possessed a real firearm.

The defendant also asserts that the seven-point enhancement for an intended loss greater than $9.5 million should not apply to him because the Third Circuit recently held that the loss enhancement pursuant U.S.S.G. ¶ 2B1.1 is limited to actual loss, the price of Bitcoin fluctuates, and by the time the defendant and his co-conspirators executed their violent scheme, Victim-2 no longer had any of the Bitcoin they sought to steal.  (*See* ECF No. 42 at 6-8.)

First, the Third Circuit's decision in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), was interpreting a separate and distinct Guidelines enhancement than what is being considered here.  Accordingly, the Government submits that *Banks* and its rationale are inapplicable to this case.  Furthermore, even if *Banks* were factually similar to this case and dealt with the same enhancement—both of which are not true—courts in this District have repeatedly rejected the conclusion that the defendant asks this Court to reach, which is inconsistent with Second Circuit precedent.  *See, e.g.*, *United States v. Powell*, 831 F. App'x 24, 25 (2d Cir. 2020) ("For the purposes of calculating the Guidelines range, loss is defined as 'the greater of actual loss or intended loss.'"); *United States v. Almaleh*, 17 Cr. 25 (ER) (S.D.N.Y. Jan. 20, 2023) (Tr. at 10-11) ("To state the

obvious, we're not in the Third Circuit, we're in the Second Circuit. And my understanding is that in this circuit, loss under the guidelines does include intended loss. That has been the case from forever."); *United States v. Rahmankulov*, 20 Cr. 653 (RA) (S.D.N.Y. Mar. 19, 2023) (Tr. at 8) ("the Defense's reliance on the Third Circuit cases notwithstanding, the Second Circuit law is clear that 'for the purposes of calculating the Guidelines range, loss is defined as the greater of actual loss or intended loss.'") (quoting *Powell*, 831 F. App'x at 25); *United States v. Oladokun*, 20 Cr. 003 (KPF) (S.D.N.Y. Feb. 1, 2023) (Tr. at 94) ("On the legal issues raised regarding the loss amount with respect to, for example, the Third Circuit's decision in *Banks*, I am adhering to the Second Circuit's decisions in cases like *Powell*. I have not seen Second Circuit decisions in this space suggesting that Courts are to in fact disregard guidelines commentary. I also agree with the government's reading of the conspiracy guideline, which includes the intended loss."); *United States v. Raji*, 19 Cr. 870 (JMF) (S.D.N.Y. Sept. 1, 2023) (Tr. at 7) ("on the distinction between intended loss and actual loss . . . [t]he Third Circuit decision is interesting . . . but the bottom line is I'm bound by the Second Circuit").

Additionally, the price fluctuations in Bitcoin and the fact that Victim-2 no longer had any of the Bitcoin at the time of the robbery attempt do not change the fact that, at the time the defendant and his co-conspirators decided to execute their home invasion robbery, the media was reporting that Victim-2 had stolen around $24 million in Bitcoin. (PSR ¶ 16; *see also* Michael Kaplan, How 'Baby Al Capone' Pulled off a $23.8 Million Crypto Heist, May 23, 2020, available at https://nypost.com/2020/05/23/baby-al-capone-ellis-pinsky-pulled-off-a-23-8-million-crypto-heist/ (published the same day of the robbery attempt).) At the time, the defendant and his co-conspirators were hoping to maximize their payday, and the information available to them indicated that approximately $24 million was what they stood to gain from their violent plot. The defendant's argument rings hollow, as he now claims the information that most likely caused him and his co-conspirators to target a teenager and his/her family is not reliable enough to be factored into his punishment, yet it was reliable enough to cause him to travel hundreds of miles, recruit others, and equip the crew with a firearm, bulletproof vests, a taser, a pellet gun that resembled a 9mm handgun, brass knuckles, a battering ram, and pepper spray, among other items.

* * * * *

## F. Conclusion

For the reasons set forth herein, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 87 to 108 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/ Kingdar Prussien
Kingdar Prussien
Assistant United States Attorney
(914) 993-1927

cc:  Francis Lee O'Reilly, Esq.